[No. S171845. Jan. 27, 2011.]

KWIKSET CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
JAMES BENSON et al., Real Parties in Interest.

**COUNSEL**

Jones, Bell, Abbott, Fleming & Fitzgerald, Michael J. Abbott, Fredrick A. Rafeedie and William M. Turner for Petitioners.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Petitioners.

Debra J. LaFetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Petitioners.

Arnold & Porter, Trenton H. Norris, Angel A. Garganta, Ronald C. Redcay and James F. Speyer for California Manufacturers & Technology Association, California Bankers Association, American Herbal Products Association, VeriSign, Inc., and BP West Coast Products LLC as Amici Curiae on behalf of Petitioners.

Robie & Matthai, James R. Robie, Kyle Kveton and Steven S. Fleischman for Association of Southern California Defense Counsel and Natural Balance Pet Foods, Inc., as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Soltan & Associates, Venus Soltan; Coughlin Stoia Geller Rudman & Robbins, Robbins Geller Rudman & Dowd, Timothy G. Blood, Pamela M. Parker, Kevin K. Green; Cuneo Gilbert & LaDuca, Jonathan W. Cuneo and Michael G. Lenett for Real Parties in Interest.

Berman DeValerio, Joseph J. Tabacco, Jr., Kevin Shelley, Nicole Lavallee and Matthew D. Pearson for California Teamsters Public Affairs Council, California Nurses Association and Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest.

Seth E. Mermin, Thomas Bennigson; The Sturdevant Law Firm, James C. . Sturdevant and Monique Olivier for Public Good, Public Citizen, National Association of Consumer Advocates, National Consumer Law Center, Consumer Action, Consumer Watchdog, CALPIRG, Consumers for Auto Reliability and Safety and Consumer Federation of California as Amici Curiae on behalf of Real Parties in Interest.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Real Parties in Interest.

Blecher & Collins, Maxwell M. Blecher and Jennifer S. Elkayam for Agudath Israel of America as Amicus Curiae on behalf of Real Parties in Interest.

Michael Wall and Jonathan Wiener for Environment California, Natural Resources Defense Council, Inc., and Sierra Club as Amici Curiae on behalf of Real Parties in Interest.

W. Scott Thorpe for California District Attorneys Association as Amicus Curiae.

## OPINION

**WERDEGAR, J.**—This case arises from Kwikset Corporation's (Kwikset) manufacturing of locksets it labeled as "Made in U.S.A." James Benson brought suit under the unfair competition and false advertising laws to challenge the labels' veracity. After a bench trial, the trial court entered judgment for Benson.

While the case was pending on appeal, the electorate enacted Proposition 64 (Gen. Elec. (Nov. 2, 2004)), which called into question Benson's standing to challenge Kwikset's country of origin representations. Benson then filed an amended complaint in which he alleged he purchased Kwikset's locksets and would not have done so but for the "Made in U.S.A." labeling. The Court of Appeal concluded this allegation was insufficient to establish standing because it did not satisfy Proposition 64's requirement that a plaintiff have "lost money or property." (See Prop. 64, §§ 3, 5.)

■ We granted review to address the standing requirements of the unfair competition and false advertising laws in the wake of Proposition 64. We conclude Proposition 64 should be read in light of its apparent purposes, i.e., to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file "shakedown lawsuits," while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices. (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) argument in favor of Prop. 64, p. 40; see also Prop. 64, § 1.) Accordingly, plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have "lost money or property" within the meaning of Proposition 64 and have standing to sue. Because plaintiffs here have so alleged, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2000, plaintiff James Benson filed a representative action against defendant Kwikset, alleging Kwikset falsely marketed and sold locksets labeled as "Made in U.S.A." that in fact contained foreign-made parts or involved foreign manufacture. The original complaint contained four counts, three asserting violations of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) for unlawful, unfair, and fraudulent business practices, and a fourth brought under the false advertising law (Bus. & Prof. Code, § 17500 et seq.). The UCL count for unlawful business practices alleged Kwikset's marketing violated both specific state and federal statutes regulating country of origin labeling (see Bus. & Prof. Code, § 17533.7; Civ. Code, § 1770, subd. (a)(4); 15 U.S.C. § 45a) and general statutes governing false advertising (Bus. & Prof. Code, § 17500 et seq.; Civ. Code, § 1770, subd. (a)(5), (7), (9), (16); 15 U.S.C. § 45). Benson sought both injunctive relief and restitution.

After a bench trial, the trial court entered judgment for Benson. It concluded Kwikset had violated Business and Professions Code section 17533.7[1] and Civil Code section 1770, subdivision (a)(4)[2] between 1996 and 2000 by placing "Made in U.S.A." or similar labels on more than two dozen products that either contained screws or pins made in Taiwan or involved

---

[1] Business and Professions Code section 17533.7 provides: "It is unlawful for any person, firm, corporation or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.' 'Made in America,' 'U.S.A.' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States."

[2] Civil Code section 1770, subdivision (a)(4) prohibits "[u]sing deceptive representations or designations of geographic origin in connection with [the sale or lease of] goods or services."

latch subassembly performed in Mexico. Based on these violations, the trial court concluded Kwikset had engaged in unlawful, unfair, and deceptive business practices under Business and Professions Code section 17200 and false advertising under Business and Professions Code section 17500, and found for Benson on each of his four causes of action.

The trial court's subsequent judgment enjoined Kwikset "from labeling any lockset intended for sale in the State of California 'All American Made,' or 'Made in USA,' or similar unqualified language, if such lockset contains any article, unit, or part that is made, manufactured, or produced outside of the United States." The trial court further ordered Kwikset to notify its California retailers and distributors of the falsely labeled products and afford them the opportunity to return improperly labeled inventory for either a monetary refund or replacement with properly labeled items. However, the trial court denied Benson's request for restitution to consumers, the end purchasers of the locksets. It concluded restitution "would likely be very expensive to administer, and the balance of equities weighs heavily against such a program" where the violations had ceased[3] and "the misrepresentations, even to those for whom the 'Made in USA' designation is an extremely important consideration, were not so deceptive or false as to warrant a return and/or refund program or other restitutionary relief to those who have been using their locksets without other complaint."

Both sides appealed. In November 2004, while the appeals were pending, the electorate approved Proposition 64, substantially revising the UCL's and false advertising law's standing provisions for private individuals. (See Bus. & Prof. Code, §§ 17204, 17535.)[4] We held these amendments applied to pending cases (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 232–233 [46 Cal.Rptr.3d 57, 138 P.3d 207]), but that a party who had filed suit on behalf of the general public before Proposition 64's enactment should be given the opportunity to allege and prove facts satisfying the new standing requirements (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242–243 [46 Cal.Rptr.3d 66, 138 P.3d 214]).

Thereafter, the Court of Appeal affirmed the trial court's decision on the underlying merits (*Benson v. Kwikset Corp., supra,* 152 Cal.App.4th at pp. 1267–1284) but vacated the judgment in light of questions concerning Benson's standing. Because Benson filed this action before passage of

---

[3] In response to the filing of this lawsuit, Kwikset decided to discontinue its country of origin labels. As well, the Federal Trade Commission (FTC) launched an unrelated investigation into Kwikset's use of country of origin labeling on its products, and Kwikset ultimately entered into a consent order with the FTC legally restricting its use of such labels. (*Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1265 [62 Cal.Rptr.3d 284].)

[4] All further unlabeled statutory references are to the Business and Professions Code.

Proposition 64, he had neither pleaded nor proven standing sufficient to meet the newly enacted requirements. In accordance with *Branick v. Downey Savings & Loan Assn., supra*, 39 Cal.4th 235, the Court of Appeal remanded the case to the trial court to afford Benson the opportunity to do so, directing the trial court to reenter its original judgment if Benson could demonstrate standing and to dismiss the action if he could not. (*Benson*, at pp. 1264, 1284.)

Benson sought and obtained leave to add additional plaintiffs (Al Snook, Christina Grecco, and Chris Wilson) and eventually filed what is now the operative complaint, the second amended complaint for equitable relief. The amended complaint alleges each plaintiff "purchased several Kwikset locksets in California that were represented as 'Made in U.S.A.' or [contained] similar designations." When purchasing the locksets each plaintiff "saw and read Defendants' misrepresentations . . . and relied on such misrepresentations in deciding to purchase . . . them. [Each plaintiff] was induced to purchase and did purchase Defendants' locksets due to the false representation that they were 'Made in U.S.A.' and would not have purchased them if they had not been so misrepresented. In purchasing Defendants' locksets, [each plaintiff] was provided with products falsely advertised as 'Made in U.S.A.,' deceiving [him or her] and causing [him or her] to buy products [he or she] did not want. Defendants' 'Made in U.S.A.' misrepresentations caused [each plaintiff] to spend and lose the money [he or she] paid for the locksets. [Each plaintiff] has suffered injury and loss of money as a result of Defendants' conduct . . . ." The second amended complaint retains the four UCL and false advertising law claims from the original complaint but, consistent with the terms of the trial court's 2002 judgment, seeks only injunctive relief, not restitution.

Kwikset demurred, but the trial court overruled the demurrer. It held plaintiffs had adequately alleged standing: "Because the plaintiffs allege they relied upon the alleged misrepresentations on the product packaging and were induced to buy products they did not want and (under the rules of liberal interpretation) suggest[ed] the products were unsatisfactory to them, the demurrer lacks merit." The complaint's allegation that Kwikset's "alleged deception caused the plaintiffs 'to buy products [they] did not want' " was "a sufficient statement the plaintiffs suffered injury in fact and lost money or property as a result of the alleged fraud and deception."

Kwikset sought and obtained writ relief. In an opinion directing the trial court to sustain Kwikset's demurrer and enter a judgment dismissing the action, the Court of Appeal explained that while plaintiffs had adequately alleged injury in fact, they had not alleged any loss of money or property. (See §§ 17204 [a private plaintiff must show "lost money or property"], 17535

[same].) Plaintiffs spent money to be sure but, the Court of Appeal reasoned, they received locksets in return, locksets they did not allege were overpriced or defective. Thus, while their "patriotic desire to buy fully American-made products was frustrated," that injury was insufficient to satisfy the standing requirements of sections 17204 and 17535.

We granted review to further explicate the UCL's and false advertising law's standing requirements in light of Proposition 64, in particular, the proposition's added "lost money or property" requirement. (§§ 17204, 17535; see Prop. 64, §§ 3, 5.)

### DISCUSSION

### I. *The UCL, the False Advertising Law, and Proposition 64*

■ The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice." (§ 17200.) Its purpose "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 [119 Cal.Rptr.2d 296, 45 P.3d 243]; see *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 852 [70 Cal.Rptr.3d 466].) In service of that purpose, the Legislature framed the UCL's substantive provisions in " 'broad, sweeping language' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181 [83 Cal.Rptr.2d 548, 973 P.2d 527]; see also *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545] ["The Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' "]) and provided "courts with broad equitable powers to remedy violations" (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1270 [61 Cal.Rptr.2d 112, 931 P.2d 290]). The state's false advertising law (§ 17500 et seq.) is equally comprehensive within the narrower field of false and misleading advertising. (See generally *Kasky*, at pp. 950–951; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210–211 [197 Cal.Rptr. 783, 673 P.2d 660].)

While the substantive reach of these statutes remains expansive, the electorate has materially curtailed the universe of those who may enforce their provisions. As we recently explained: "In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by 'any person acting for the interests of itself, its members or the general public' (former § 17204, as amended by Stats. 1993, ch. 926, § 2, p. 5198), now private standing is limited to any 'person who has suffered

injury in fact and has lost money or property' as a result of unfair competition (§ 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3; see *Californians for Disability Rights v. Mervyn's, LLC*[, *supra*,] 39 Cal.4th [at pp.] 227–228 . . .). The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of ' "clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . ." ' (*Californians for Disability Rights*, at p. 228, quoting Prop. 64, § 1, subd. (b)(3).) [¶] While the voters clearly intended to restrict UCL standing, they just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices. (Prop. 64, § 1, subds. (b), (d); see § 17204.)" (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788 [111 Cal.Rptr.3d 666, 233 P.3d 1066].) Proposition 64 made identical changes to the standing provision of the false advertising law; where once "any person acting for the interests of itself, its members or the general public" (former § 17535, as amended by Stats. 1972, ch. 711, § 3, p. 1300) could sue, now standing is limited to "any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter" (§ 17535, as amended by Prop. 64, § 5). The question here is what these changes, and especially the requirement that a party have "lost money or property," actually mean.

 " We interpret voter initiatives using the same principles that govern construction of legislative enactments. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226].) Thus, we begin with the text as the first and best indicator of intent. (*Ibid.*; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) If the text is ambiguous and supports multiple interpretations, we may then turn to extrinsic sources such as ballot summaries and arguments for insight into the voters' intent. (*Professional Engineers*, at p. 1037; *Legislature v. Eu* (1991) 54 Cal.3d 492, 504 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 673, fn. 14 [194 Cal.Rptr. 781, 669 P.2d 17].)" (*People v. Mentch* (2008) 45 Cal.4th 274, 282–283 [85 Cal.Rptr.3d 480, 195 P.3d 1061]; see also *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 315–317 [93 Cal.Rptr.3d 559, 207 P.3d 20] [applying these principles to the interpretation of Prop. 64's standing requirement].)

 As we have said, "Proposition 64 accomplishes its goals in relatively few words." (*Californians for Disability Rights v. Mervyn's, LLC, supra*, 39 Cal.4th at p. 228.) Fewer than two dozen are at issue here: under the UCL, standing extends to "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition" (§ 17204), while under the false advertising law, in materially identical language, standing

extends to "any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter" (§ 17535).

■ As we shall explain, a party who has lost money or property generally *has* suffered injury in fact. Consequently, the plain language of these clauses suggests a simple test: To satisfy the narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim. We explore these elements in turn.

## II. *Standing Under Section 17204*

### A. *Injury in Fact*

"Injury in fact" is a legal term of art. A long line of United States Supreme Court cases has identified injury in fact as one of the three " 'irreducible minimum' " requirements for federal standing under article III, section 2 of the United States Constitution, and has accorded the phrase a well-settled meaning. (*Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville* (1993) 508 U.S. 656, 664 [124 L.Ed.2d 586, 113 S.Ct. 2297]; see also, e.g., *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* (2000) 528 U.S. 167, 180–181 [145 L.Ed.2d 610, 120 S.Ct. 693]; *Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 560–561 [119 L.Ed.2d 351, 112 S.Ct. 2130].) The text of Proposition 64 establishes expressly that in selecting this phrase the drafters and voters intended to incorporate the established federal meaning. The initiative declares: "It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been *injured in fact under the standing requirements of the United States Constitution.*" (Prop. 64, § 1, subd. (e), italics added; see also *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 814 [66 Cal.Rptr.3d 543].)[5]

■ Under federal law, injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, [citations]; and (b) 'actual or imminent, not "conjectural" or "hypothetical," ' [citation]." (*Lujan v. Defenders of Wildlife, supra*, 504 U.S. at p. 560, fn. omitted; see also *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.*

---

[5] There are sound reasons to be cautious in borrowing federal standing concepts, born of perceived constitutional necessity, and extending them to state court actions where no similar concerns apply. (See generally *Jasmine Networks, Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 990–993 [103 Cal.Rptr.3d 426].) Here, however, the electorate has expressly directed courts to do so. (See *id.* at p. 992, fn. 5.)

(1999) 21 Cal.4th 352, 362 [87 Cal.Rptr.2d 654, 981 P.2d 499].) "Particularized" in this context means simply that "the injury must affect the plaintiff in a personal and individual way." (*Lujan*, at p. 560, fn. 1.)

As we shall discuss, proof of injury in fact will in many instances overlap with proof of the next element of standing, to have "lost money or property." (§§ 17204, 17535.) Accordingly, litigants and courts may profitably consider whether injury in fact has been shown in conjunction with the allegations and proof of having lost money or property, to which we now turn.

### B. *"Lost Money or Property": Economic Injury*

Proposition 64 requires that a plaintiff have "lost money or property" to have standing to sue. The plain import of this is that a plaintiff now must demonstrate some form of economic injury. (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1591 [80 Cal.Rptr.3d 316] [rejecting a claim where the plaintiff failed to allege " 'actual economic injury' "]; *Animal Legal Defense Fund v. Mendes* (2008) 160 Cal.App.4th 136, 147 [72 Cal.Rptr.3d 553] ["This language discloses a clear requirement that injury must be economic, at least in part, for a plaintiff to have standing under" § 17204]; *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 803 [49 Cal.Rptr.3d 555] [permitting a claim to proceed where "the allegations set forth a basis for a claim of actual economic injury . . ."].)

■ There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. (See, e.g., *Hall v. Time Inc., supra*, 158 Cal.App.4th at pp. 854–855 [cataloguing some of the various forms of economic injury].) Neither the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of "lost money or property," nor can or need we supply an exhaustive list of the ways in which unfair competition may cause economic harm. It suffices to say that, in sharp contrast to the state of the law before passage of Proposition 64, a private plaintiff filing suit now must establish that he or she has personally suffered such harm.

Notably, lost money or property—economic injury—is itself a classic form of injury in fact. (See, e.g., *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., supra*, 528 U.S. at pp. 183–184 [economic harm is among the bases for injury in fact]; *Troyk v. Farmers Group, Inc.* (2009) 171

Cal.App.4th 1305, 1347 [90 Cal.Rptr.3d 589] [" 'While it is difficult to reduce injury-in-fact to a simple formula, *economic injury* is one of its paradigmatic forms.' " (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.* (3d Cir. 2005) 432 F.3d 286, 291)].) However, because economic injury is but one among many types of injury in fact, the Proposition 64 requirement that injury be economic renders standing under section 17204 substantially narrower than federal standing under article III, section 2 of the United States Constitution, which may be predicated on a broader range of injuries.[6] (See *Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at p. 1348, fn. 31 ["We note [the] UCL's standing requirements appear to be more stringent than the federal standing requirements. Whereas a federal plaintiff's 'injury in fact' may be intangible and need not involve lost money or property, Proposition 64, in effect, added a requirement that a UCL plaintiff's 'injury in fact' specifically involve 'lost money or property.' "].)

While the economic injury requirement is qualitatively more restrictive than federal injury in fact, embracing as it does fewer kinds of injuries, nothing in the text of Proposition 64 or its supporting arguments suggests the requirement was intended to be quantitatively more difficult to satisfy. Rather, we may infer from the text of Proposition 64 that the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact; if more were needed, the drafters could and would have so specified. (Cf. Prop. 64, § 1, subd. (e) ["It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution."].) In turn, federal courts have reiterated that injury in fact is not a substantial or insurmountable hurdle; as then Judge Alito put it: "Injury-in-fact is not Mount Everest." (*Danvers Motor Co., Inc. v. Ford Motor Co., supra,* 432 F.3d at p. 294.) Rather, it suffices for federal standing purposes to " 'allege[] some specific, "identifiable trifle" of injury.' " (*Ibid.*; accord, *Hale v. Sharp*

---

[6] See *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., supra,* 528 U.S. at pages 183–184 (recreational and aesthetic harms may also support injury in fact); *Lujan v. Defenders of Wildlife, supra,* 504 U.S. at page 562 (loss of opportunity to watch animal species, "even for purely esthetic purposes," may constitute injury in fact); *Japan Whaling Assn. v. American Cetacean Soc.* (1986) 478 U.S. 221, 230–231, footnote 4 [92 L.Ed.2d 166, 106 S.Ct. 2860] (impairment of whale watching is injury in fact); *United States v. SCRAP* (1973) 412 U.S. 669, 686 [37 L.Ed.2d 254, 93 S.Ct. 2405] (injury in fact is not confined to " 'economic harm' " and extends to harm to the "use and enjoyment of the natural resources" of an area); *Sierra Club v. Morton* (1972) 405 U.S. 727, 734 [31 L.Ed.2d 636, 92 S.Ct. 1361] (" 'injury in fact' " extends to damage to aesthetic and environmental interests).

*Healthcare* (2010) 183 Cal.App.4th 1373, 1383 [108 Cal.Rptr.3d 669]; *Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at p. 1347.)[7]

Thus, in *Clayworth v. Pfizer, Inc., supra,* 49 Cal.4th at pages 788–789, we found standing where the plaintiffs alleged they had paid an overcharge—more than they otherwise would have—because of an alleged price-fixing cartel. In *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1090 [56 Cal.Rptr.3d 861, 155 P.3d 268], we concluded the plaintiff had standing because the unfair business practice allegedly had resulted in repossession of her vehicle (a loss of property) and a monetary payment in response to an unlawful debt collection demand (a loss of money). And in *Aron v. U-Haul Co. of California, supra,* 143 Cal.App.4th at pages 802–803, the Court of Appeal found standing where the plaintiff alleged he was required to purchase more fuel than he otherwise would have because of the defendants' business practices. In each instance, the plaintiff could allege or prove an identifiable monetary or property injury.

We offer a further observation concerning the order in which the elements of standing are best considered. Because, as noted, economic injury is itself a form of injury in fact, proof of lost money or property will largely overlap with proof of injury in fact.[8] (See *Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at p. 1348 [where the alleged harm is economic injury, injury in fact and lost money or property are "one and the same"].) If a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact. Because the lost money or property requirement is more difficult to satisfy than that of injury in fact, for courts to first consider whether lost money or property has been sufficiently alleged or proven will often make sense. If it has not been, standing is absent and the inquiry is complete. If it has been, the same allegations or proof that suffice to establish economic injury will generally show injury in fact as well (*ibid.*), and thus it will again often be the case that no further inquiry is needed.

---

[7] " 'The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' " (*United States v. SCRAP, supra,* 412 U.S. at p. 689, fn. 14, quoting Davis, *Standing: Taxpayers and Others* (1968) 35 U. Chi. L.Rev. 601, 613.)

[8] The dissent contends that by recognizing the potential for overlap in the *proof* of the separate elements, injury in fact and lost money or property, we have conflated the two elements themselves (dis. opn., *post,* at pp. 339, 343) and, as a result, made it easier for a plaintiff to establish standing (*id.* at pp. 338, 343). Not at all. We simply state the obvious: that proof of lost money or property will generally satisfy the element of injury in fact. Nowhere do we suggest the converse: that proof of injury in fact will necessarily satisfy the element of lost money or property.

### C. *"As a Result of": Causation or Reliance*

■ Proposition 64 requires that a plaintiff's economic injury come "as a result of" the unfair competition or a violation of the false advertising law. (§§ 17204, 17535.) "The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." (*Hall v. Time Inc., supra*, 158 Cal.App.4th at p. 855; see also *Troyk v. Farmers Group, Inc., supra*, 171 Cal.App.4th at p. 1349 ["the phrase 'as a result of' connotes an element of *causation* (i.e., [plaintiff] lost money *because of* [defendants'] unfair competition)"]; *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105, 115 [78 Cal.Rptr.3d 672] ["the 'as a result' language imports a *reliance or causation* element into" § 17204].) This commonsense reading of the language mirrors how we have interpreted the same language in other consumer protection statutes such as the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.). (See *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 641 [88 Cal.Rptr.3d 859, 200 P.3d 295] [Civ. Code, § 1780, subd. (a), granting standing to consumers who have suffered damage "as a result of" a violation, imposes a requirement that a violation must "caus[e] or result[] in some sort of damage"]; *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1292 [119 Cal.Rptr.2d 190] ["as a result of" language in Civ. Code, § 1780, subd. (a) imposes a cause requirement].)

■ This case, like *In re Tobacco II Cases*, "is based on a fraud theory involving false advertising and misrepresentations to consumers." (*In re Tobacco II Cases, supra*, 46 Cal.4th at p. 325, fn. 17.) Our discussion there of the meaning of the "as a result of" causation requirement is controlling here.[9] Recognizing that "reliance is the causal mechanism of fraud" (*In re Tobacco II Cases*, at p. 326), we held that a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in

---

[9] While plaintiffs also allege unlawful conduct, in that Kwikset violated Business and Professions Code sections 17500 and 17533.7 and Civil Code section 1770, subdivision (a)(4), these statutory provisions simply codify prohibitions against certain specific types of misrepresentations. The theory of the case is that Kwikset engaged in misrepresentations and deceived consumers. Thus, our remarks in *In re Tobacco II Cases, supra*, 46 Cal.4th 298, concerning the cause requirement in deception cases, are apposite. (See *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1363 [108 Cal.Rptr.3d 682] ["[T]he reasoning of *Tobacco II* [concerning the cause requirement] applies equally to the 'unlawful' prong of the UCL when, as here, the predicate unlawfulness is misrepresentation and deception."]; *Hale v. Sharp Healthcare, supra*, 183 Cal.App.4th at p. 1385 [*In re Tobacco II Cases*'s discussion of causation applies equally to unlawful UCL claims based on misrepresentation].) As in *In re Tobacco II Cases*, at page 325, footnote 17, we need express no views concerning the proper construction of the cause requirement in other types of cases.

ordinary fraud actions" (*id.* at p. 306).[10] Consequently, "a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct . . . ." (*In re Tobacco II Cases*, at p. 326.) However, a "plaintiff is not required to allege that [the challenged] misrepresentations were the sole or even the decisive cause of the injury-producing conduct." (*Id.* at p. 328.)

Thus, for example, in *Hale v. Sharp Healthcare, supra*, 183 Cal.App.4th at pages 1385–1386, the Court of Appeal found the complaint adequate where from its allegations one could infer the plaintiff had relied on a defendant's representation that it would charge its " ' "regular rates." ' " In contrast, in *Durell v. Sharp Healthcare, supra*, 183 Cal.App.4th at pages 1363–1364, the plaintiff failed to allege any reliance on representations about rates; accordingly, a demurrer to a UCL claim challenging those representations was properly sustained. (See also *Hall v. Time Inc., supra*, 158 Cal.App.4th at p. 857 [a demurrer was properly sustained where the plaintiff did not allege that misrepresentations caused him to pay money for a book or that he would otherwise have returned the book to avoid payment].)

III. *Application of Section 17204 to Plaintiffs*

■ We apply these principles to plaintiffs' pleadings. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. [Citations.] At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " (*Lujan v. Defenders of Wildlife, supra*, 504 U.S. at p. 561; see also *Troyk v. Farmers Group, Inc., supra*, 171 Cal.App.4th at p. 1345.) At this stage, these plaintiffs need only allege economic injury arising from reliance on Kwikset's misrepresentations. According to the second amended complaint, (1) Kwikset labeled certain locksets with "Made in U.S.A." or a similar designation, (2) these representations were false, (3) plaintiffs saw and relied on the labels for their truth in purchasing Kwikset's locksets, and (4) plaintiffs would not have bought the locksets

---

[10] "Reliance" as used in the ordinary fraud context has always been understood to mean reliance on a statement for its truth and accuracy. (E.g., *Spreckels v. Gorrill* (1907) 152 Cal. 383, 395 [92 P. 1011] [" 'Every contracting party has a right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual agreement . . . .' "].) It follows that a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made. (See *Buckland v. Threshold Enterprises, Ltd., supra*, 155 Cal.App.4th at pp. 818–819 [concluding a party who had bought a product suspecting it was mislabeled in order to pursue a UCL fraud action had not established standing].)

otherwise. On their face, these allegations satisfy all parts of the section 17204 standing requirement, as we shall explain.[11]

Simply stated: labels matter. The marketing industry is based on the premise that labels matter—that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source. (E.g., *FTC v. Proctor & Gamble Co.* (1967) 386 U.S. 568, 572 [18 L.Ed.2d 303, 87 S.Ct. 1224] [noting the central role of advertising and sales promotion in generating market share, where the competing products are functionally identical].) An entire body of law, trademark law (see, e.g., 15 U.S.C. § 1051 et seq.; [Lanham Act]), exists to protect commercial and consumer interests in accurate label representations as to source, because consumers rely on the accuracy of those representations in making their buying decisions.

To some consumers, processes and places of origin matter. (See Kysar, *Preferences for Processes: The Process/Product Distinction and the Regulation of Consumer Choice* (2004) 118 Harv. L.Rev. 525, 529 ["[C]onsumer preferences may be heavily influenced by information regarding the manner in which goods are produced."]; *ibid.* [Although the circumstances of production "generally do not bear on the functioning, performance, or safety of the product, they nevertheless can, and often do, influence the willingness of consumers to purchase the product."].)[12] Whether a particular food is kosher or halal may be of enormous consequence to an observant Jew or Muslim. Whether a wine is from a particular locale may matter to the oenophile who values subtle regional differences. Whether a diamond is conflict free[13] may matter to the fiancée who wishes not to think of supporting bloodshed and

---

[11] Kwikset contends these allegations are untrue, at least as to James Benson if not the other more recently added plaintiffs. At the demurrer stage, however, we must take the allegations as true. (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 152, fn. 1 [41 Cal.Rptr.3d 299, 131 P.3d 383].) At succeeding stages, it will be plaintiffs' obligation to produce evidence to support, and eventually to prove, their bare standing allegations. (*Lujan v. Defenders of Wildlife, supra,* 504 U.S. at p. 561; *Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at pp. 1345, 1351; see also *United States v. SCRAP, supra,* 412 U.S. at p. 689 [standing "allegations must be true and capable of proof at trial"].) If they cannot, their action will be dismissed.

[12] The analogy between trademark designations, which have been protected since medieval times (Diamond, *The Historical Development of Trademarks* (1975) 65 Trademark Rep. 265, 277–280), and process or source designations such as those at issue in this case is actually quite close. (See Kysar, *Preferences for Processes: The Process/Product Distinction and the Regulation of Consumer Choice, supra,* 118 Harv. L.Rev. at p. 611 [noting that in certain respects "process representations by manufacturers function quite similarly to trademarks, logos, brands, and other conventional product emblems that typically do not affect the compositional features of the product, but that nevertheless exert great influence over consumer decisionmaking."].)

[13] See generally United Nations General Assembly Resolution No. 55/56 (Dec. 1, 2000) (recognizing the problem of "conflict diamonds" and supporting an international certification

human rights violations each time she looks at the ring on her finger. And whether food was harvested or a product manufactured by union workers may matter to still others. (See *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 969 ["For a significant segment of the buying public, labor practices do matter in making consumer choices."].)

In particular, to some consumers, the "Made in U.S.A." label matters. A range of motivations may fuel this preference, from the desire to support domestic jobs, to beliefs about quality, to concerns about overseas environmental or labor conditions, to simple patriotism. The Legislature has recognized the materiality of this representation by specifically outlawing deceptive and fraudulent "Made in America" representations. (§ 17533.7; see also Civ. Code, § 1770, subd. (a)(4) [prohibiting deceptive representations of geographic origin].) The object of section 17533.7 "is to protect consumers from being misled when they purchase products in the belief that they are advancing the interests of the United States and its industries and workers. (Sen. Holmdahl, sponsor of [Sen. Bill No. 1004 (1961 Reg. Sess.)] [which became § 17533.7] . . . , letter to Governor Brown, May 23, 1961) ['There are many Americans who feel that American-made articles are of higher quality, and who rely on the "Made in U.S.A." label'].)" (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 689 [38 Cal.Rptr.3d 36].) The Legislature evidently recognized some companies were using or might be tempted to use inaccurate "Made in America" labeling, that some consumers might be deceived by and rely on it, and that consumers and competitors who honestly made their wares in the United States and marketed them as such were being or would be harmed.

For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately. This economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent. A counterfeit Rolex might be proven to tell the time as accurately as a genuine Rolex and in other ways be functionally equivalent, but we do not doubt the consumer (as well as the company that was deprived of a sale) has been economically harmed by the

process for rough diamonds); 19 United States Code section 3901(1) ("Funds derived from the sale of [conflict] diamonds are being used by rebels and state actors to finance military activities, overthrow legitimate governments, subvert international efforts to promote peace and stability, and commit horrifying atrocities against unarmed civilians."); Fishman, *Is Diamond Smuggling Forever? The Kimberley Process Certification Scheme: The First Step Down the Long Road to Solving the Blood Diamond Trade Problem* (2005) 13 U. Miami Bus. L.Rev. 217, 219–224 (discussing the role of blood diamonds in supporting war and human rights violations).

substitution in a manner sufficient to create standing to sue. Two wines might to almost any palate taste indistinguishable—but to serious oenophiles, the difference between one year and the next, between grapes from one valley and another nearby, might be sufficient to carry with it real economic differences in how much they would pay. Nonkosher meat might taste and in every respect be nutritionally identical to kosher meat, but to an observant Jew who keeps kosher, the former would be worthless.

■ A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation.[14] That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, i.e., that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[15]

Were we to conclude otherwise, we would bring to an end private consumer enforcement of bans on many label misrepresentations, contrary to the apparent intent of Proposition 64. (See Prop. 64, § 1, subd. (d) [preserving in part the right of private individuals to sue].) That public prosecutors can still sue is of limited solace, given the significant role we have recognized private consumer enforcement plays for many categories of unfair business practices. (*In re Tobacco II Cases, supra*, 46 Cal.4th at p. 313; *Kraus v. Trinity*

---

[14] The dissenting opinion objects to having a plaintiff's subjective motivations in making a purchase play any role in deciding standing. (Dis. opn., *post*, at pp. 340–342.) Of course, such considerations are a routine part of common law deceit actions: we will allow one party who subjectively relied on a particular deception in entering a transaction to sue, while simultaneously precluding another who subjectively did not so rely from suing. To consider them in the context of a statutory deceit action thus is wholly unremarkable.

[15] Because the issue here is only the threshold matter of standing, not whether and how much to award in restitution, a specific measure of the amount of this loss is not required. It suffices that a plaintiff can allege an " 'identifiable trifle' " (*United States v. SCRAP, supra*, 412 U.S. at p. 689, fn. 14) of economic injury. Once this threshold pleading requirement has been satisfied, it will remain the plaintiff's burden thereafter to prove the elements of standing and of each alleged act of unfair competition, and the trial court's role to exercise its considerable discretion to determine which, if any, of the various equitable and injunctive remedies provided for by sections 17203 and 17535 may actually be warranted in a given case.

*Management Services, Inc.* (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].)[16] The UCL and false advertising law are both intended to preserve fair competition and protect consumers from market distortions. (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 949; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 180; *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at pp. 209–210; *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 110 [101 Cal.Rptr. 745, 496 P.2d 817].) Contrary to that general purpose, if we were to deny standing to consumers who have been deceived by label misrepresentations in making purchases, we would impair the ability of consumers to rely on labels, place those businesses that do not engage in misrepresentations at a competitive disadvantage, and encourage the marketplace to dispense with accuracy in favor of deceit.

The Court of Appeal offered three interrelated reasons for concluding plaintiffs had not lost money or property within the meaning of section 17204: they failed to allege any overcharge or functional defects in the locksets; they received the benefit of their bargain; and they were ineligible for restitution. Kwikset echoes these arguments in its briefs, and the dissenting opinion takes them up as well. We consider each in turn.

The Court of Appeal reasoned that plaintiffs could not show economic injury because, while they had spent money, they "received locksets in return." (See also dis. opn., *post,* at p. 339.) Plaintiffs did not allege the locksets were defective, overpriced, or of inferior quality. In the Court of Appeal's and dissent's eyes, cognizable economic harm is confined to these sorts of objective "functional" differences.

We discern two textual difficulties with this view. First, while the alternate allegations of loss the Court of Appeal posited and the dissent demands might well satisfy the economic injury requirement, nothing in the open-ended phrase "lost money or property" supports limiting the types of qualifying losses to functional defects of these sorts and excluding the real economic harm that arises from purchasing mislabeled products in reliance on the truth and accuracy of their labels. Second, the economic injuries the Court of Appeal would require in order to allow one to sue for misrepresentation are in many instances wholly unrelated to any alleged misrepresentation. An allegation that Kwikset's products are of inferior quality, for example, even if it might demonstrate lost money or property, would not demonstrate lost money or property "as a result of" unfair competition or false advertising

---

[16] Notably, the public prosecutors who have appeared in this action, amicus curiae the California District Attorneys Association, support plaintiffs' construction of the standing requirement and express many of the same concerns noted in the text about the consequences of the Court of Appeal's reading of the statute.

about the product's origins. (§§ 17204, 17535.) The Court of Appeal's take on standing, underinclusive as to the economic injuries that might qualify, is overinclusive as to the injuries that might be considered causally related to false advertising.

Next, at the core of both the Court of Appeal's ruling and Kwikset's and the dissent's position is that plaintiffs should not be accorded standing because they received the benefit of their bargain. Kwikset argues, and the Court of Appeal agreed, that consumers who receive a fully functioning product have received the benefit of their bargain, even if the product label contains misrepresentations that may have been relied upon by a particular class of consumers. (See also *Peterson v. Cellco Partnership, supra,* 164 Cal.App.4th at p. 1591 [plaintiffs lacked standing because "they received the benefit of their bargain, having obtained the bargained for insurance at the bargained for price."].)

█ Whether or not a party who actually received the benefit of his or her bargain may lack standing, in this case, under the allegations of the complaint, plaintiffs did not. (Cf. *Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at p. 1348, fn. 30 [declining to apply the benefit of the bargain rationale where the record showed the plaintiff in fact had not received the benefit of his bargain].) Plaintiffs selected Kwikset's locksets to purchase in part because they were "Made in U.S.A."; they would not have purchased them otherwise; and, it may be inferred, they value what they actually received less than either the money they parted with or working locksets that actually were made in the United States. They bargained for locksets that were made in the United States; they got ones that were not. The same points may be made generally with regard to consumers who purchase products in reliance on misrepresentations. The observant Jew who purchases food represented to be, but not in fact, kosher; the Muslim who purchases food represented to be, but not in fact, halal; the parent who purchases food for his or her child represented to be, but not in fact, organic, has in each instance not received the benefit of his or her bargain.

The argument that a consumer in plaintiffs' position has received the benefit of the bargain notwithstanding any misrepresentation may rest on one of two unstated predicates: that either (1) the misrepresentation at issue should be deemed not a material part of the bargain, or (2) even if the consumer does not value what he or she received as much as what he or she paid, the marketplace would, and its valuation should be dispositive.

█ "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' . . . ." (*Engalla v. Permanente*

*Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [64 Cal.Rptr.2d 843, 938 P.2d 903], quoting Rest.2d Torts, § 538, subd. (2)(a).) In the alternative, it may also be material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." (Rest.2d Torts, § 538, subd. (2)(b).) Here, the Legislature has by statute made clear that whether a product is manufactured in the United States or elsewhere is precisely the sort of consideration reasonable people can and do attach importance to in their purchasing decisions. (See § 17533.7.)[17] Indeed, Kwikset packaged its products with labels like "All American Made & Proud Of It" and "Made in U.S.A." because it determined such marketing might sway reasonable people in their purchasing decisions. In any event, as materiality is generally a question of fact (*Engalla*, at p. 977), it is not a basis on which to decide this case on demurrer.

Under the second implicit line of reasoning, a consumer who has acquired a mislabeled product has lost no money or property if the marketplace would continue to value the product as highly as the amount the consumer paid for it, whether or not he or she would do so.[18] The argument that plaintiffs got the benefit of their bargain because they received locksets is shorthand for the idea that they could as easily turn around and sell the locksets to someone else for the same price. There are four difficulties with this way of concluding no money or property has been lost in the original transaction.

First, it assumes there *is* a functioning aftermarket for resale that would allow a plaintiff to liquidate the good in question by reselling it to those for whom the misrepresentation is immaterial. This plainly is not so in many instances. While there are certainly consumers for whom the kosher, halal or organic quality of food is immaterial, there is no functioning aftermarket that would permit easy resale of, for example, perishable foodstuffs and small-ticket consumer goods. A gallon of nonorganic "organic" milk cannot be resold. A consumer who has purchased products mislabeled in this fashion cannot recoup his or her purchase price.

Second, it assumes a consumer has no qualms—religious, ethical, or otherwise—that would preclude his or her partaking in resale of the misla-beled product, or at least none that the law should respect.

---

[17] Notably, the United States government certainly does. (See 41 U.S.C. § 10a [requiring federal agencies generally to purchase goods made in the U.S.].)

[18] This line of reasoning appears to lie at the heart of the dissent's position: the dissenting opinion essentially argues that we should read into the text of Proposition 64 a requirement that overpayments induced by fraud are only cognizable and a basis for standing if they can be measured according to some independent, objective market. Aside from the absence of a textual basis for such a limitation, this approach is flawed for reasons we detail hereafter. (See *post*, at pp. 333–334.)

Third, it assumes that resale will not involve transaction costs and that an individual consumer will be able to resell the mislabeled product at the same price. But even for goods where there *is* a functioning aftermarket, resale will generally require the deceived buyer to sell at a reduced price to account for the facts the good is being resold and the source (an individual consumer) is less reliable than the original seller (a commercial establishment). In such instances, there still has been a loss of money.

Fourth, it ignores that the law generally disregards such "pass-on" sales. (See *Clayworth v. Pfizer, Inc., supra,* 49 Cal.4th at pp. 768–769.) Kwikset's argument, that a deceived buyer has lost nothing because he or she has the value of the item still possessed, can be viewed as a pass-on defense in disguise: the buyer has an item that, through a presumed functioning after-market, he or she could convert back into an equivalent amount of money, recouping through the subsequent sale any perceived loss. But in the eyes of the law, a buyer forced to pay more than he or she would have is harmed at the moment of purchase, and further inquiry into such subsequent transactions, actual or hypothesized,[19] ordinarily is unnecessary. (*Id.* at pp. 768–769, 788–789.)[20]

In its benefit of the bargain argument, Kwikset relies as well on two real property fraud cases, each of which recites the rule that damages for fraud in the sale of property are measured principally by the difference in the actual value of what was parted with and what was received (the "out-of-pocket loss" rule). (See *Gagne v. Bertran* (1954) 43 Cal.2d 481, 490–492 [275 P.2d 15]; *Jacobs v. Levin* (1943) 58 Cal.App.2d Supp. 913, 915–918 [137 P.2d 500]; Civ. Code, § 3343 [codifying rule].) In the context of a common law deceit action, the rule's only purpose is to provide the measure of damages; it limits neither standing nor the availability of equitable remedies. (See *Jacobs*, at p. 918 [deceived party can seek rescission]; Civ. Code, § 3343, subd. (b)(2) [damages rule shall not be used to "[d]eny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."].)

Nothing in the text or history of Proposition 64 suggests the electorate intended to borrow this rule, developed in the context of a remedy (damages)

---

[19] Here there is no evidence of any resale. Accordingly, plaintiffs are still out the money they paid and have in its place only a product they value at less than what they paid.

[20] Kwikset's implicit argument is that the materiality of a representation must be proven by reference to a market that charges more for products that carry a particular label. The implications of this argument are significant. In any market with generally parallel pricing (whether through conscious parallelism or otherwise), where competitors use representations about features principally to increase market share rather than to charge a premium, any deception in such representations would no longer be privately enforceable by consumers. We do not see expressed in Proposition 64 any intent to deregulate the commercial speech marketplace of ideas to this extent.

unavailable under the UCL and false advertising law, and deploy it for a wholly unrelated purpose, as a restriction on standing. Indeed, doing so would render standing under the UCL and false advertising law substantially more difficult to establish than standing to assert common law deceit: As Kwikset's counsel properly acknowledged at oral argument, a consumer who purchased a product in reliance on an alleged misrepresentation would under the common law have standing to sue for fraud, misrepresentation, and rescission without having first to prove, as Kwikset argues the UCL and false advertising law now require, that the product received was worth less than the money paid for it. While Proposition 64 clearly was intended to abolish the portions of the UCL and false advertising law that made suing under them *easier* than under other comparable statutory and common law torts, it was not intended to make their standing requirements comparatively *more* onerous.[21] We thus decline to write the out-of-pocket loss damages rule into section 17204's standing definition.

Finally, the Court of Appeal rested its holding in part on a line of cases that have read the "lost money or property" requirement as confining standing under section 17204 " 'to individuals who suffer losses . . . that are eligible for restitution.' " (Quoting *Buckland v. Threshold Enterprises, Ltd., supra,* 155 Cal.App.4th at p. 817; see also *Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 245 [109 Cal.Rptr.3d 27]; *Citizens of Humanity, LLC v. Costco Wholesale Corp.* (2009) 171 Cal.App.4th 1, 22 [89 Cal.Rptr.3d 455]; *Walker v. GEICO General Ins. Co.* (9th Cir. 2009) 558 F.3d 1025, 1027 [following *Buckland*].) Because plaintiffs were not entitled to restitution, the Court of Appeal reasoned, they necessarily lacked standing.

As we recently have noted, however, the standards for establishing standing under section 17204 and eligibility for restitution under section 17203 are

---

[21] Proposition 64's Findings and Declarations of Purpose (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) p. 109) expressed concern that the UCL and false advertising law were being "misused by some private attorneys" (Prop. 64, § 1, subd. (b)) to file suits on behalf of "clients who [had] not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant" (*id.,* subd. (b)(3)) and had not "been injured in fact" (*id.,* subd. (b)(2)) as a way of "generating attorney's fees without creating a corresponding public benefit" (*id.,* subd. (b)(1)). In short, voters focused on curbing shakedown suits by parties who had never engaged in *any* transactions with would-be defendants. (See *In re Tobacco II Cases, supra,* 46 Cal.4th at pp. 316–317.) No corresponding concern was expressed about suits by those who had had business dealings with a given defendant, and nothing suggests the voters contemplated eliminating statutory standing for consumers actually deceived by a defendant's representations. (See *Clayworth v. Pfizer, Inc., supra,* 49 Cal.4th at p. 789, fn. 25 [accepting the defendant's arguments "would render the UCL's standing requirement substantially *more* stringent than other state unfair competition statutes such as the Cartwright Act, under which [the plaintiffs'] standing is undisputed. Again, we see nothing in the text or history of Proposition 64 that suggests the voters intended such a result."].)

wholly distinct. (See *Clayworth v. Pfizer, Inc., supra*, 49 Cal.4th at p. 789.) For the drafters of Proposition 64, which amended both sections 17203 and 17204, to make standing under section 17204 expressly dependent on eligibility for restitution under section 17203 would have been easy enough,[22] but nothing in the text or history of Proposition 64 suggests this was intended. (*Clayworth*, at pp. 788–789.) We thus rejected in *Clayworth* the argument that if the plaintiffs could demonstrate no compensable losses or entitlement to restitution under section 17203, they would lack standing under section 17204. As we explained, "this argument conflates the issue of standing with the issue of the remedies to which a party may be entitled. That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them." (*Clayworth*, at p. 789.)

Moreover, to interpret standing as dependent on eligibility for restitution would narrow section 17204 in a way unsupported by its text. Restitution under section 17203 is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other. (See *Kraus v. Trinity Management Services, Inc., supra*, 23 Cal.4th at pp. 126–127.) But the economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses. (See *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 716 [61 Cal.Rptr.3d 29] [a plaintiff who alleged that a defendant's defamatory statements diminished its assets and reduced its market capitalization adequately alleged UCL standing]; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1240, 1262 [29 Cal.Rptr.3d 521] [a plaintiff whose home and car were vandalized by defendant animal rights protesters adequately alleged lost property under Prop. 64].) Such injuries satisfy the plain meaning of section 17204's "lost money or property" requirement, qualify as injury in fact, and would permit a plaintiff to seek an injunction against the offending business practice even in the absence of any basis for restitution. (See *Clayworth v. Pfizer, Inc., supra*, 49 Cal.4th at pp. 789–790 [parties may seek an injunction under the UCL whether or not restitution is also available]; *ABC Internat. Traders, Inc. v. Matsushita Electric*

---

[22] Compare, for example, the language of section 17204 with the language of Civil Code section 1780, subdivision (a), which includes in the standing requirements under the Consumers Legal Remedies Act (CLRA) that a consumer be able to prove damages. (See *Meyer v. Sprint Spectrum L.P., supra*, 45 Cal.4th at p. 646 ["the Legislature ... . set a low but nonetheless palpable threshold of damage . . ." for standing to sue under the CLRA].)

*Corp., supra*, 14 Cal.4th at p. 1268 [§ 17203 "contains . . . no language of condition linking injunctive and restitutionary relief"].)

■ This leads to a larger point: To make standing under section 17204 dependent on eligibility for restitution under section 17203 would turn the remedial scheme of the UCL on its head. Injunctions are "the primary form of relief available under the UCL to protect consumers from unfair business practices," while restitution is a type of "ancillary relief." (*In re Tobacco II Cases, supra*, 46 Cal.4th at p. 319.) As the availability of an injunction depends on standing to sue, if standing to sue depends on eligibility for restitution, then injunctive relief—the primary form of relief under the UCL—has been rendered dependent on the availability of a mere ancillary form of relief. As we have recognized, "Proposition 64 did not amend the remedies provision of section 17203." (*In re Tobacco II Cases*, at p. 319.) We have no reason to believe it sub silentio dramatically changed the relative availability of the remedies contained in section 17203.

■ Accordingly, we hold ineligibility for restitution is not a basis for denying standing under section 17204 and disapprove those cases that have concluded otherwise. (See *Silvaco Data Systems v. Intel Corp., supra*, 184 Cal.App.4th 210, 245; *Citizens of Humanity, LLC v. Costco Wholesale Corp., supra*, 171 Cal.App.4th 1, 22; *Buckland v. Threshold Enterprises, Ltd., supra*, 155 Cal.App.4th 798, 817.)

### DISPOSITION

For the foregoing reasons, we reverse the Court of Appeal's judgment and remand this case for further proceedings consistent with this opinion.

Kennard, Acting C. J., Baxter, J., Moreno, J., and George, J.,* concurred.

**CHIN, J.,** Dissenting.—I respectfully dissent.

In 2004, voters passed Proposition 64, which substantially changed the standing requirements for a private plaintiff to sue under the unfair competition law (UCL) (see Bus. & Prof. Code, § 17200 et seq.).[1] "The voters' intent in passing Proposition 64 and enacting the changes to the standing rules in

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] While the voters made identical changes to the standing provision of the false advertising law (Bus. & Prof. Code, § 17535, as amended by Prop. 64, § 5; see maj. opn., *ante*, at pp. 318, 321), my focus is on the UCL. Further undesignated statutory references are to the Business and Professions Code.

Business and Professions Code section 17204 was unequivocally to narrow the category of persons who could sue businesses under the UCL." (*Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 853 [70 Cal.Rptr.3d 466] (*Hall*).) To have standing under the UCL, a plaintiff must have suffered "injury in fact" *and* have "lost money or property" as a result of an unfair business practice. (§ 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3 (Proposition 64); see also § 17203.) In direct contravention of the electorate's intent, the majority disregards the express language of the amendment and makes it easier for a plaintiff to achieve standing under the UCL.

A. *Meaning of "Lost Money or Property"*

As relevant here, in the wake of Proposition 64, section 17204 now provides that a private plaintiff may bring a UCL action if he or she "has suffered injury in fact *and* has lost money or property as a result of the unfair competition." (§ 17204, as amended by Prop. 64, § 3, italics added.) The amendment clearly sets out two requirements to establish standing. (See *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1590 [80 Cal.Rptr.3d 316] (*Peterson*) ["private plaintiff must make a twofold showing"].) As the majority correctly points out, the crux of the issue here is the meaning of "lost money or property." (Maj. opn., *ante*, at p. 321.)

Several Courts of Appeal have defined a loss for purposes of section 17204 as " '[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way.' " (*Hall, supra*, 158 Cal.App.4th at p. 853, quoting Black's Law Dict. (8th ed. 2004) p. 963; see *Peterson, supra*, 164 Cal.App.4th at p. 1592.) In other words, a person has not "lost" money simply when the money is " 'no longer in [his or her] possession' " because "this proposed definition encompasses every purchase or transaction where a person pays with money." (*Peterson, supra*, 164 Cal.App.4th at p. 1592.)

Despite finding section 17204's meaning to be "plain" (maj. opn., *ante*, at pp. 322, 336), the majority does not actually attempt to define what "lost money or property" means except to find that it now requires a UCL private plaintiff to "demonstrate some form of economic injury." (Maj. opn., *ante*, at p. 323 [citing cases]; cf. *id.* at p. 331 ["open-ended phrase 'lost money or property' "].) Throughout its opinion, the majority refers to "economic injury" as shorthand for the statutory requirement. (*Id.* at pp. 323, 325, 330, 331, 336.) However, the Court of Appeal cases on which the majority relies do not support this conclusion. In discussing economic injury, each of these cases was referring to the requirement of "injury in fact" and not, as the majority suggests, to "lost money or property." (See *Peterson, supra*, 164

Cal.App.4th at pp. 1591–1592 [by failing to allege "they suffered actual economic injury," plaintiffs failed to allege facts showing "injury in fact"]; *Hall, supra,* 158 Cal.App.4th at pp. 854–855 [listing examples constituting "injury in fact"]; *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 802 [49 Cal.Rptr.3d 555] (*Aron*) [plaintiff has claim for actual economic injury by alleging " 'injury in fact' in that he suffered economic loss"]; see also *Animal Legal Defense Fund v. Mendes* (2008) 160 Cal.App.4th 136, 147 [72 Cal.Rptr.3d 553] [language that plaintiffs "have suffered 'injury in fact *and* [have] lost money or property' " "discloses a clear requirement that injury must be economic"].) Thus, although the majority catalogues the "innumerable ways" in which *economic injury* may be shown (maj. opn., *ante,* at p. 323), this does not shed light on the meaning of "lost money or property" under section 17204.

The majority later correctly recognizes that economic injury is a type of injury in fact. (See maj. opn., *ante,* at pp. 323, 325.) However, this observation does little to clarify what the statute actually means. By failing to expressly define "lost money or property" and by instead equating it with economic injury, the majority effectively collapses the two separate requirements of section 17204 into one. This is far more than what the majority acknowledges it is doing, namely, recognizing the overlap between the *proof* of the "injury in fact" and "lost money or property" elements. (See maj. opn., *ante,* at p. 325.) Rather, the majority's conclusion that "[a]t this stage, these plaintiffs need only allege economic injury arising from reliance on Kwikset's misrepresentations" (*id.* at p. 327), effectively renders one of the two statutory requirements " 'redundant and a nullity.' " (*Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 817 [66 Cal.Rptr.3d 543].) "We must take the language . . . as it was passed into law, and must, if possible without doing violence to the language and spirit of the law, interpret it so as to harmonize and give effect to all its provisions." (*People v. Garcia* (1999) 21 Cal.4th 1, 14 [87 Cal.Rptr.2d 114, 980 P.2d 829].)

In this case, plaintiffs alleged that " 'Defendants' "Made in U.S.A." misrepresentations caused [each plaintiff] to spend and lose the money [he or she] paid for the locksets.' " (Maj. opn., *ante,* at p. 319.) The majority claims that the economic harm suffered in this context is "the loss of real dollars from a consumer's pocket . . . ." (*Id.* at p. 329.) Plaintiffs, however, received the locksets in return, which were not alleged to be overpriced or otherwise defective. Aside from paying the purchase price of the locksets, plaintiffs have not alleged they actually "lost" any money or property. (See *Peterson, supra,* 164 Cal.App.4th at p. 1592; *ante,* at p. 338.)

In that regard, the cases the majority relies on (see maj. opn., *ante,* at p. 325) are readily distinguishable. In each, the UCL plaintiff did not simply

purchase a product or service as a result of an alleged unfair business practice, but suffered an actual measurable *loss* in the transaction. (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788 [111 Cal.Rptr.3d 666, 233 P.3d 1066] [plaintiffs "lost money: the overcharges they paid"]; *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1090 [56 Cal.Rptr.3d 861, 155 P.3d 268] [plaintiff was deprived of a "fair opportunity to redeem the financed vehicle, followed by an unlawful demand for payment"]; *Aron, supra,* 143 Cal.App.4th at pp. 802–803 [plaintiff had standing where he paid more to refuel rental truck than required under contract]; see also *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1348 [90 Cal.Rptr.3d 589] [plaintiff's "alleged payment of money *in addition to* the premium stated in his insurance policy sufficiently alleges lost money" (italics added & omitted)].)

## B. *Subjective Motivations*

In order to bolster its conclusion that plaintiffs have "lost money" (or in its view, suffered "economic injury") under section 17204, the majority focuses on plaintiffs' subjective motivations, noting that "to some consumers, the 'Made in U.S.A.' label matters" (maj. opn., *ante,* at p. 329), and that in purchasing a mislabeled product, a consumer may have "valued the money he or she parted with more than the product as it actually is." (*Id.* at p. 330.) The majority concludes "that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, i.e., that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue." (*Id.* at p. 330.) I disagree on several grounds.

First, "there is no statutory basis, at least in terms of the Proposition 64 amendment, to differentiate UCL actions based on the subjective *motivation* of the plaintiff; the differentiation is between instances where there is actual loss of property versus no such loss." (*Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105, 115, fn. 11 [78 Cal.Rptr.3d 672] (*Medina*).) Whatever value the consumer may subjectively assign to the product (as the majority points out, see maj. opn., *ante,* at p. 329, the preference to buy United States-made products may stem "from the desire to support domestic jobs, to beliefs about quality, to concerns about overseas environmental or labor conditions, to simple patriotism"), plaintiffs have failed to allege that their personal preference is reflected in any cost differential between the mislabeled and correctly labeled products.[2] Contrary to the majority's suggestion, my concern is not directed towards whether or

---

[2] The majority asserts that the economic injury need only be in a "nontrivial amount" (maj. opn., *ante,* at p. 325) or an " ' "identifiable trifle" ' " to establish standing at this pleading stage (*id.* at pp. 324, 325 & fn. 7, 330, fn. 15). But this characterization goes to injury in fact (see

not a party subjectively, or actually, relies on a particular deception, which may be relevant in a common law deceit action. (Maj. opn., *ante*, at p. 330, fn. 14; see *id.* at p. 326 [" 'reliance is the causal mechanism of fraud' "].) Rather, under the majority's holding, it is enough for a private plaintiff to simply allege, "I would not have bought the product but for the misrepresentation," to establish not only causation but also an injury cognizable under section 17204. (Maj. opn., *ante*, at p. 330.) An allegation that merely identifies the party's subjective motivation clearly does not track the language of the section.

Second, it is unclear what constitutes the *"extra* money paid" in this context (maj. opn., *ante*, at p. 330, italics added), where plaintiffs simply paid the purchase price for the mislabeled but otherwise fully functional locksets. Of course, the majority presents striking examples of products for which a consumer would have overpaid because of certain misrepresentations. For instance, the majority maintains that a consumer who buys a counterfeit Rolex watch believing it to be a genuine Rolex (though both watches may accurately tell time), "has been economically harmed by the substitution in a manner sufficient to create standing to sue." (*Id.* at pp. 329–330.) It also asserts that consumers who purchase mislabeled kosher, halal, or organic foods would satisfy the UCL's new standing requirements. (See maj. opn., *ante*, at pp. 328–329, 332.) One can hardly dispute that these genuine products have greater value placed on them than on their mislabeled counterparts,[3] and consumers who buy the latter may allege and prove they actually paid (and therefore, lost) extra money based on the mislabeling. Yet even these examples, though extreme, obscure the breadth of the majority's holding, which in fact does *not* require that plaintiffs allege any price differential. Under the majority's holding, a consumer may satisfy the UCL's new standing requirements merely by alleging that "he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury." (Maj. opn., *ante*, at p. 330, fn. omitted.) This is simply too low a threshold to meet, and, more importantly, it is not the one contemplated by Proposition 64.

*United States v. SCRAP* (1973) 412 U.S. 669, 686 [37 L.Ed.2d 254, 93 S.Ct. 2405]), and not, as I have pointed out, to the "lost money" requirement under section 17204. (See *ante*, at pp. 338–339.)

[3] Generally speaking, a counterfeit Rolex watch, which is inferior in quality with substandard parts, is clearly overpriced, and a consumer has actually lost money in that transaction by buying what he or she thought was a real Rolex. Likewise, both kosher and halal foods are more expensive than their conventional counterparts because the former require special handling and adherence to special customs. Similarly, organic foods are also typically more expensive because they are grown, handled, and processed differently than conventional foods.

To counter any natural inclination to construe the term "lost money or property" as an additional requirement to "injury in fact," the majority focuses on what it perceives to be the main purpose of Proposition 64, i.e., "to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits . . .' . . . ." (Maj. opn., *ante*, at p. 317; see *id.* at pp. 320–321, 335, fn. 21.) In other words, because Proposition 64's materials do not "purport to define or limit the concept of 'lost money or property,' . . . [i]t suffices to say that, in sharp contrast to the state of the law before passage of Proposition 64, a private plaintiff filing suit now must establish that he or she has personally suffered such harm." (Maj. opn., *ante*, at p. 323.) The issue here, however, is not that a plaintiff must show that he or she *personally* suffered harm, but that the harm alleged must be an actual measurable loss of money or property.

## C. *Intent Behind Proposition 64*

The text of the amendment, as the majority recognizes, is "the first and best indicator of intent." (*People v. Mentch* (2008) 45 Cal.4th 274, 282 [85 Cal.Rptr.3d 480, 195 P.3d 1061]; see maj. opn., *ante*, at p. 321.) As discussed above, Proposition 64 amended section 17204 to add *two* separate requirements to establish standing, i.e., a private plaintiff must have suffered "injury in fact" and "lost money or property as a result of the unfair competition." (§ 17204, as amended by Prop. 64, § 3.) Instead of interpreting the statutory language, however, the majority focuses on certain language in Proposition 64's "Findings and Declarations of Purpose" (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) p. 109), which explained to voters that some private attorneys were misusing the UCL by filing "frivolous lawsuits as a means of generating attorney's fees without creating a corresponding public benefit," "*lawsuits where no client has been injured in fact*," "*lawsuits for clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant*," and "lawsuits on behalf of the general public without any accountability to the public and without adequate court supervision." (Prop. 64, § 1, subd. (b)(1)–(4), italics added.) Based partly on the italicized language, the majority asserts that "[n]o corresponding concern was expressed about suits by those who had had business dealings with a given defendant, and nothing suggests the voters contemplated eliminating statutory standing for consumers actually deceived by a defendant's representations." (Maj. opn., *ante*, at p. 335, fn. 21.)

I believe the majority misperceives the intent of Proposition 64 by focusing too heavily on the genesis of the initiative, i.e., misuse of certain UCL lawsuits by some attorneys, while giving the language of the amendment

short shrift. Rather than grapple with the meaning of "lost money or property," the majority conflates this requirement with "injury in fact," effectively making it *easier* for a plaintiff to establish standing through a "simple test" (maj. opn., *ante*, at p. 322; see *ante*, at pp. 338–339), and emphasizes there is nothing in the initiative materials prohibiting such a construction (see maj. opn., *ante*, at pp. 317, 321, 335, fn. 21). This cannot be what voters envisioned in passing Proposition 64. (See *Medina, supra*, 164 Cal.App.4th at p. 115 ["[t]he point of the Proposition 64 amendment was to impose *additional* requirements on plaintiffs . . ."].)

In clearly stating to voters what the measure does, the "Official Title and Summary" prepared by the Attorney General explained that Proposition 64 "[l]imits individual's right to sue by allowing private enforcement of unfair business competition laws only if that individual was actually injured by, *and suffered financial/property loss* because of, an unfair business practice." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) official title and summary of Prop. 64, p. 38, italics added.) The Legislative Analyst confirmed that the measure prohibits a private person from bringing a UCL action "unless the person has suffered injury *and lost money or property*." (Voter Information Guide, *supra*, analysis of Prop. 64 by Legis. Analyst, p. 38, italics added.) Although the majority quotes certain language from the Findings and Declarations of Purpose that does not cover the precise nature of the present action, this does not in any way negate the broader language of the amendment itself nor the summary and analysis discussed above.

Indeed, to the extent the majority contends there is nothing to suggest that voters were concerned about frivolous lawsuits apart from those brought by unaffected plaintiffs (see maj. opn., *ante*, at p. 335, fn. 21), we need look no further than the present case. Proponents of Proposition 64 included the underlying action on their Web site as an example of a "shakedown" lawsuit.[4] One newspaper editorial explained at the time voters were considering the ballot initiative that "[a] measure on the November ballot, Proposition 64, would do much to curb the shakedown lawsuits to which Justice Sills [(dissenting in *Benson v. Kwikset Corp.*)] referred. Such suits affect not only deep-pocket companies like Kwikset but also untold thousands of small

---

[4] (See the following materials archived at UCLA Online Campaign Literature Collection: Californians to Stop Shakedown Lawsuits, Yes on 64 <http://digital.library.ucla.edu/websites/2004_996_013/facts_examples.html> [as of Jan. 27, 2011]; ElectionWatchdog.org, No on 64 [compiling links to anti-Prop. 64 articles] <http://digital.library.ucla.edu/websites/2004_996_011/index.htm> [as of Jan. 27, 2011]; Avalos, *Prop. 64 draws strong arguments*, Contra Costa Times (Oct. 25, 2004) <http://digital.library.ucla.edu/websites/2004_996_011/nw/nw000155.php.htm> [as of Jan. 27, 2011].)

businesses in California."[5] Another newspaper article pointed out that Proposition 64's proponents asserted "Benson's case is a prime example of the lawsuit abuse they seek to curb."[6] While these may not constitute official materials presented to voters, these materials, at the very least, undermine the majority's assertion that voters were concerned only about suits by parties who had no business dealings with a given defendant and, more importantly, they underscore the question we must answer here—what does "lost money or property" mean in this context?

## D. *Private Enforcement Actions*

The majority also suggests that a contrary interpretation of section 17204 would sound the death knell for private enforcement actions based on label misrepresentations. (Maj. opn., *ante*, at pp. 330–331.) I disagree. Plaintiffs here did not allege that these mislabeled locksets were overpriced or defective, but simply alleged that they would not have bought the locksets but for the mislabeling. This, however, is not the kind of economic loss required by Proposition 64. In other situations where plaintiffs *do* allege that a mislabeled product was overpriced, and that they did in fact lose money, they would have standing to bring a private action under the UCL. Moreover, as the majority points out (maj. opn., *ante*, at p. 320), the UCL's purpose "is to protect both consumers *and competitors* by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 [119 Cal.Rptr.2d 296, 45 P.3d 243], italics added.) Although the action here focused on alleged injuries to consumers, Kwikset's competitors may very well bring suit. A competitor who properly labeled its locksets "Made in U.S.A." and alleges it was forced to charge higher prices for such locksets, and another who manufactured its locksets outside the United States and alleges it lost customers to Kwikset, could both claim they were at competitive and economic disadvantages to Kwikset. In each instance, these competitors could allege not only injury in fact, but also economic injury for lost sales and profits due to Kwikset's misrepresentation.

## E. *Conclusion*

A consumer who purchases a product based on a defendant's misrepresentation may very well achieve standing under the UCL's new requirements. But the consumer must allege that he or she suffered an injury in fact and lost

---

[5] (*Measure would curb shakedown lawsuits*, The San Diego Union-Tribune (Oct. 6, 2004) <http://www.signonsandiego.com/uniontrib/20041006/news_lz1ed6top.html> [as of Jan. 27, 2011].)

[6] (Hinch, *Lawsuit cited as 'frivolous' defended; Filer says Prop. 64 proponents are misleading voters about case*, Orange County Register (Oct. 28, 2004) <http://digital.library.ucla.edu/websites/2004_996_011/nw/nw000158.php.htm> [as of Jan. 27, 2011].)

money or property in the transaction (see § 17204); the loss must be alleged by more than a simple reference to the price the consumer paid for the product. Plaintiffs here have failed to do that. More importantly, the majority relieves them of this burden. All plaintiffs now have to allege is that they would not have bought the mislabeled product. (Maj. opn., *ante*, at p. 330.) This cannot be what the electorate intended when it sought "unequivocally to narrow the category of persons who could sue businesses under the UCL." (*Hall, supra*, 158 Cal.App.4th at p. 853.) "In the case of a voters' initiative statute . . . we may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less." (*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114 [86 Cal.Rptr.2d 884, 980 P.2d 433].)

I respectfully dissent.

Corrigan, J., concurred.